**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FRANK ARGENTIERI and | : | |
| DIANA ARGENTIERI, h/w | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| FIRST VEHICLE SERVICES, INC. and | : | NO.  10-2086 |
| FIRST TRANSIT, INC. | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                                         February 28, 2011

  Currently pending before the Court is the Motion by Defendant First Vehicle Services, Inc.

for Summary Judgment.  For the following reasons, the Motion is denied.

**I.  FACTUAL AND PROCEDURAL HISTORY**

  Plaintiff Frank Argentieri was employed as a driver/deliverer for DHL Holdings, Inc.

("DHL").  (Compl. ¶ 6.)[1]  According to Plaintiff, in late October 2008, the diamond plate metal

covering on the floor in the back of his DHL-issued truck had separated, causing a "lip" or raised

portion of the floor to form above the adjacent floor covering.  (Pl.'s Resp. Mot. Summ. J., Ex. B,

Dep. of Frank Argentieri, 121:7-10, Sep. 21, 2010 ("Argentieri Dep.").)  At approximately 10:30

a.m. on November 5, 2008, while walking from the back to the front of his delivery truck, he tripped

on the broken floor and suffered various injuries.  (Id.; Compl. ¶ 6.)  The case before the Court

arises from these events.

---

[1]  To the extent the Court references the Complaint for factual allegations, Defendant concedes,
in its Motion for Summary Judgment, that such allegations are true.

## A.     The Fleet Maintenance Agreement

During the times relevant to this case, Defendant First Vehicle Services, Inc. ("FVS") had a Fleet Maintenance Agreement (the "Contract") with DHL for the repair and maintenance of DHL trucks.  (Def.'s Mot. Summ. J., Ex. C.)  Aubrey Felton, Regional Vice President of FVS, testified that this Contract was drafted by DHL and paraphrased the Federal Motor Carrier Safety Act. (Def.'s Mot. Summ. J., Ex. D, Dep. of Aubrey Felton, 16:9-23, Nov. 4, 2010 ("Felton Dep.")). According to the Contract's provisions, Defendant's obligations fell under two basic services: preventative maintenance and other repair duties.[2]  (Id. at 31:5-32:5.)

With respect to the preventative maintenance aspect, Exhibit B, section 6.1 of the Contract required Defendant to:

---

[2]     Mr. Felton explained as follows:

> Q.     Under the terms of this contract that we're discussing today, your company was responsible for more than preventive maintenance, correct?
> A.     Well, our company is responsible for doing any services that DHL requires of us, because we bill them time and material.
> Q.     Which goes above and beyond preventive maintenance, correct?
> A.     Correct.  It's repairs, as well.
> Q.     And preventive maintenance, to your knowledge, as someone who's been in the automotive industry for many years is what?
> A.     Preventive maintenance is scheduled services done to any vehicle based on manufacturer's standards in order to get the maximum life expectancy out of that vehicle.
> Q.     And examples of that would be what?
> A.     As far as an actual PM [preventative maintenance] service.
> Q.     Sure.
> A.     Typical change the oil, check all the fluids, inspect for any kind of suspension damage, inspect the brakes, things like that.
> Q.     And anything above or beyond that, if DHL asked you to do it, you guys would do it, if it was within your capabilities?
> A.     Yes.

(Id. at 31:5-32:5.)

perform PMIs [Preventive Maintenance Inspections] according to the schedule and PMI checklist hereto attached as Exhibit C. [Defendant] shall meet or exceed the terms and conditions necessary to comply with the DHL, OEM specifications, DOT or local and/or state standards. . . . [Defendant] shall perform PMIs as specified by DHL for the type or classification of vehicle as set forth on Exhibit C.

(Contract, at Ex. B, § 6.1.)  None of the items on the Preventive Maintenance Checklist, attached as Exhibit C to the Contract, included inspection of the interior floor surface.  (Id. at Ex. C.)

As to FVS's obligation to repair damage not covered by the preventive maintenance provisions, Exhibit B, section 7 of the Contract provided as follows:

**Unscheduled Maintenance and Repairs** - Repairs and services performed by the [Defendant] under this Agreement shall be provided at the Hourly Rate with the exception of PMIs and other fixed rate operations as expressly set forth in Exhibit D. [Defendant] shall perform repairs included on the daily driver write-ups, which shall be scheduled into the regular workload unless it is a safety related repair or DOT issue.  Safety-related or DOT Issues shall take precedence and the appropriate DHL Manager shall be notified by the close of business each day, of any such issue. [Defendant's] technicians shall be responsible for acknowledging the daily write-ups by signing-off on the completed work order prior to filling out DHL's 425 Form [a/k/a "daily driver write-up"] in the book and scheduling for corrective action. Copies of the 425 Form will be attached to the appropriate work orders and retained in the local fleet file.

(Id. Ex. B § 7.0.)  Multiple witnesses acknowledged that to trigger FVS's duty to perform such additional repair services, a daily driver write-up, or 425 Form, had to be submitted by the driver.

First, Mr. Felton testified:

A.    Well, in general we have to receive either what DHL refers to as a 425, which is actually a Driver's Vehicle Inspection Report which is mandated by the Federal Motor Carrier Safety Act.  We have to receive that in writing to perform work if it's under $250.  If we receive that it goes above $250, we have to contact the DHL Express Area fleet manager who in turn would have to issue what they call a fleet authorization number or appeal; if you will, for us to do any services.. . .

Q.    Who would initially generate the 425, to your knowledge?

A.    It's the driver's responsibility to generate a 425.

Q.       According to your knowledge, where would that go?

A.       Well, the 425 is actually a book. And the book is supposed to stay with the vehicle. They tear out one portion of the form and they turn it in to their supervisor or where ever DHL mandated that they put them.

(Felton Dep. 10:17-11:23.) Likewise, Paul Talarico, the DHL Shop Manager and Plaintiff's supervisor, went over the process for a driver to obtain non-routine repairs:

Q.       Can you please walk me through the steps on what a driver is supposed to do with 425 booklet, what any supervisor or management is supposed to do with the actual 425 copy, where it will go and how it will get over to First Vehicle Services in the time period of November 2008?

A.       What is supposed to happen is the driver is supposed to visually inspect his vehicle and note any defects that he encounters during his inspection on the 425. He's also supposed to examine for any defects that were listed to make sure they were corrected. He then signs it off prior to leaving the building. He's supposed to obtain a management signature after he signs off in the morning. The same process takes [place] at night. They return to the station, any defects they see on the vehicle during the day they would note and they would sign it off and have a manager person sign it off.

(Def.'s Mot. Summ. J., Ex. H, Dep. of Paul Talarico, 31:19-16, Sept. 23, 2010 ("Talarico Dep.").)

Mr. Argentieri himself testified:

A.       [T]he mechanic would always say fill out a 425 because they would get paid for fixing that.
. . .
Q.       I'm still trying to get an understanding of your testimony, that they would only do the repair if the 425 was completed?

A.       Yes.

(Argentieri Dep. 111:2-17.) Finally, Gregory Sangmeister and Michael Ritz, both DHL drivers, stated that any time they had a repair done, they completed a 425 Form as a matter of course.

(Pls.' Resp. Mot. Summ. J., Exs. D & G, Dep. of Gregory Sangmeister, 18:15-19:11, Sep. 29, 2010

("Sangmeister Dep.");[3] Def.'s Mot. Summ. J., Ex. K, Dep. of Michael Ritz, 21:11-22:22, Feb. 17,

2011 ("Ritz Dep.").)

### B.    Notification of Defendants Regarding the Alleged Dangerous Condition

Plaintiff testified that, during the period two to three weeks prior to his accident, he

submitted a 425 Form approximately ten to fifteen times specifically noting a "crack in the floor"

and requesting repair of that defect.  (Argentieri Dep. 116:4-117:15, 118:15-17, 119:22-24.)   He

explained the process he followed in submitting his 425 Form:

> Q.     Is that [the 425 Form] something you would complete at the end of your
>        shift?
>
> A.     Yes, ma'am.
>
> Q.     Did the supervisor sign that before you tore the white copy out?
>
> A.     Yes, ma'am.
>
> Q.     Okay.  And once you tore the white copy out at the end of the day, if I
>        understand you, it would include your pre-inspection with the supervisor's
>        signature, as well as your post inspection with another supervisor's signature,
>        could be the same man, but a second signature?
>
> A.     Yes.
>
> Q.     And you tear the top copy off, the white copy?
>
> A.     Yes, ma'am.

---

[3]  Plaintiffs contend that Mr. Sangmeister indicated that repairs had been done to damaged
portions of his truck floor without completion of a 425 Form.  (Pls.' Resp. Mot. Summ. J. ¶ 19.)
The portion of Mr. Sangmeister's testimony cited by Plaintiff, however, does not support this
proposition.  In fact, when asked if he completed a 425 Form for the repair to his truck floor, he
responded, "I can't be certain of that.  I would say probably, I did, but I can't be sure, I might
have just brought it to Steve's attention."  (Sangmeister Dep. 18:24-19:3.)  He could not recall
any specific time where he had repairs done to his truck, other than for general maintenance,
where he did not fill out a 425 Form.  (Id. at 19:4-11.)

Q. And what did you do with the white copy?

A. It was handed in. We had a very simple box, a little cardboard box written 425 and they were handed in like that.

Q. So, there was only one place to place those 425's?

A. Yes.

Q. And where was the box located?

A. Well, they moved. One was located on our loading dock area which we referred to as dock. And there was another period of time where it was in the dispatcher's office which were the supervisor's.

Q. In October 2008 where was the 425 box located?

A. I believe it was on the loading dock.

. . .

Q. There were never two places simultaneously where you could choose to drop them?

A. Right.

(Id. at 112:5-114:1.) In addition to submission of the 425 Forms, Plaintiff also gave oral notice to FVS employee Tom Weaver and showed him the lip created in the floor. (Id. at 117:16-24, 120:3-15.) Weaver simply responded that he would "get to it." (Id.)

Notably, however, neither Mr. Talarico nor James McEnhill, the DHL assistant shop steward, had any clear recollection of Plaintiff's alleged request to repair a cracked floor. Mr. Talarico remarked:

Q. Would it have been unusual for a request for repair to be documented on that many occasions, 10 to 15 occasions?

A. I don't know.

Q. Do you think that somebody at DHL would have heard about it, if a driver had been documenting on that many occasions the need for a repair, yet the repair wasn't done?

A.    I would imagine somebody would have heard about it, yes.

Q.    Was it the practice that the drivers and the supervisors would verbally talk about the need for repairs.

A.    Yes.

Q.    So, when you say somebody would have heard about it, do you mean a supervisor would have heard about it?

A.    Somebody probably would have heard about it.  I would imagine it would be a supervisor.

. . .

Q.    And in this particular instance, had you heard anything about the request for a repair to a cracked floor?

A.    No.  I did not.

(Talarico Dep. 83:8-84:3, 84:17-20.)  Likewise Mr. McEnhill stated that, as assistant shop steward, he saw all paperwork, "whether it was 425 forms, anything, [he] went through everything."  (Def.'s Mot. Summ. J., Ex. J., Dep. of James McEnhill, 26:10-12, Sept. 29, 2010 ("McEnhill Dep.").)  He indicated that he was uncertain as to whether Plaintiff had completed a 425 Form:

Q.    Are you aware, one way or the other, if Mr. Argentieri completed a 425, documenting a cracked floor plate or some reference to a cracked floor?

A.    No, I was not.

Q.    Are you aware of, one way or another, whether or not the 425 which Mr. Argentieri alleges he completed, was delivered to First Vehicle Services?

A.    No.

(Id. at 30:8-17.)

During the course of the time between Plaintiff's first alleged reporting of the crack and the date of the accident, the condition of the floor worsened, creating a second "lip" in the floor.  (Id. at 119:1-9, 120-22.)  Argentieri never had the opportunity to report the second lip prior to his accident.

(Id. at 120:16-121:8.)  It was this second lip over which Plaintiff tripped and injured himself.  (Id. at 120:21-22.)

### C. **Procedural Background**

In April 2010, Plaintiffs Frank Argentieri and his wife Diana Argentieri initiated a lawsuit in the Philadelphia County Court of Common Pleas against Defendant FVS and First Transit, Inc., alleging negligence and loss of consortium.  On May 10, 2010, Defendants removed the case to federal court on grounds of diversity jurisdiction.  The following December, the parties agreed to dismiss Defendant First Transit, Inc. from the case, leaving FVS as the only Defendant.

Thereafter, on December 22, 2010, Defendant filed the current Motion for Summary Judgment, seeking dismissal of Plaintiffs' entire Complaint.  Plaintiff responded on January 12, 2011, making the matter ripe for consideration by this Court.

## II. **STANDARD OF REVIEW**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all

8

reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the nonmovant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Anderson, 477 U.S. at 249-50.

## III.    DISCUSSION

The pending Motion for Summary Judgment is premised on three separate grounds. First, Defendant argues that it owed no duty of care to Plaintiff. Second, Defendant contends that, even if it owed a duty of care, that duty was not triggered since it had no notice of the alleged dangerous

condition. Finally, Defendant claims that the cracked truck floor was so trivial a condition as to foreclose imposition of liability. The Court considers each argument individually.

### A.     Whether Defendant Owed a Duty of Care to Plaintiff

Defendant first alleges that Plaintiff has not proven the first element of negligence – a duty of care flowing from Defendant to Plaintiff. Under Pennsylvania law, "[t]o establish a cause of action in negligence, the plaintiff must demonstrate that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." Martin v. Evans, 711 A.2d 458, 461 (Pa. 1998). "Negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." Id. (citing Lanni v. Pa. R.R. Co., 88 A.2d 887 (Pa. 1952)). Notably, "[t]he mere occurrence of an accident does not establish negligent conduct." Id. (citations omitted). Rather, the plaintiff bears the burden of proving that defendant "engaged in conduct that deviated from the general standard of care expected under the circumstances, and that this deviation proximately caused actual harm." Id. (citing Hamil v. Bashline, 392 A.2d 1280 (Pa. 1978)).

The determination of whether a duty of care exists is a question of law. Spence v. ESAB Group, Inc., 623 F.3d 212, 216 (3d Cir. 2010). The Pennsylvania Supreme Court has recognized that:

> The concept of duty is rooted in public policy, and the determination of whether a duty should be imposed upon an alleged tortfeasor involves a balancing of the following factors: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution."

Sharpe v. St. Luke's Hosp., 821 A.2d 1215, 1219 (Pa. 2003) (quoting Althaus v. Cohen, 756 A.2d 1166, 1169 (Pa. 2000)). "Duty, in any given situation, is predicated on the relationship existing between the parties at the relevant time . . . and necessarily requires some degree of knowledge."

Morena v. S. Hills Health Sys., 462 A.2d 680, 684 (Pa. 1983) (citations omitted).  Mere knowledge

of a dangerous situation, however, will not give rise to a duty to act or warn.  Snyder v. ISC Alloys,

Ltd., 772 F. Supp. 244, 253 (W.D. Pa. 1991).  "Instead, the defendant's conduct must actually create

the hazardous condition."  Id.

 "[A] party to a contract by the very nature of his contractual undertaking may place himself

in such a position that the law will impose upon him a duty to perform his contractual undertaking

in such manner that third persons – strangers to the contract – will not be injured thereby."  Evans v.

Otis Elevator Co., 168 A.2d 573, 575 (Pa. 1961).  As provided by the Restatement (Second) of

Torts:

> One who undertakes, gratuitously or *for consideration*, to render services to another
> which he should recognize *as necessary for the protection of a third person* or his
> things, *is subject to liability to the third person* for physical harm resulting from his
> failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the
> undertaking.

RESTATEMENT (SECOND) TORTS § 324A (emphasis added); see also Cantwell v. Allegheny County,

483 A.2d 1350, 1353-53 (Pa. 1984) (adopting § 324A of the Restatement (Second) of Torts).

Liability under this section thus "requires an undertaking 'to render services to another.'"

Farabaugh v. Pa. Turnpike Comm'n, 911 A.2d 1264, 1283 (Pa. 2006).  Moreover, there must some

showing of foreseeability, *i.e.* that the defendant should have foreseen that his actions were

necessary for the protection of third parties to the contract.  Waddell v. Bowers, 609 A.2d 847, 849

(Pa. Super. Ct. 1992).

 In the present case, Defendant concedes that it had a written Contract to render services to

DHL for the repair and maintenance of DHL-owned vehicles.  Moreover, the Court finds – and

Defendant implicitly admits – that Defendant could have foreseen that its obligations under the Contract were necessary for the protection of third parties, *i.e.*, the DHL-employed drivers of the vehicles it was servicing.  See <u>Farabaugh</u>, 911 A.2d at 1283-84 (holding that it was foreseeable that a defendant's failure to properly perform the active safety and inspection role it assumed under its contract with a construction company could result in injury to the third-party workers at the site).

Instead, the focus of the parties' disagreement concerns the scope of Defendant's duties under that Contract and whether those duties encompassed repair of the specific defect in question. Defendant argues that its contractual obligation to provide preventative maintenance on the DHL work vehicles did not include inspection and repair of the interior of the work vehicle, including the interior floor surface.  Although it also "had the duty to perform unscheduled maintenance repairs upon written request," (Def.'s Mem. Supp. Mot. Summ. J. 5), it claims that it had no duty to repair the floor surface of Plaintiff's work truck absent receipt of some written notice of the alleged condition.  Because the record contains no evidence that FVS was advised of any request to repair the floor of Plaintiff's DHL truck, Defendant seeks dismissal of the case.  (<u>Id.</u> at 5-6.)

While Defendant's argument has partial merit, it is nonetheless an insufficient basis on which the Court may grant summary judgment.  Two provisions of the Contract are relevant to a determination of this issue.  First, as set forth above, under Exhibit B section 6.1, Defendant was obligated to perform preventative maintenance inspections as repairs "as specified by DHL." (Contract, Ex. B, § 6.1.)  The Preventive Maintenance Checklist specified by DHL in Exhibit C to the Contract did not include any inspection of any vehicle interior, let alone inspection of the interior floor surface.  (<u>Id.</u> at Ex. C.)  Accordingly, the Court finds that Defendant had no contractually-mandated duty to maintain the floor of Plaintiff's truck.

The second – and more contentious – provision is found in section 7.0, which, as quoted above, deals with unscheduled maintenance and repairs. (Id. at Ex. B § 7.0.) Plaintiffs argue that, by reference to the Federal Motor Carrier Safety Act, 49 U.S.C. § 31131, et seq., this provision imposes an independent duty on Defendant to discover and make certain safety-related repairs. The Department of Transportation's ("DOT") regulations to that Act specifically provide that, "[t]he flooring in all motor vehicles shall be substantially constructed, free of unnecessary holes and openings, and shall be maintained so as to minimize the entrance of fumes, exhaust gases, or fire. Floors shall not be permeated with oil or other substances likely to cause injury to persons using the floor as a traction surface." 49 C.F.R. §393.84. Plaintiffs reason that "[t]hat Act, and the Department of Transportation Regulation therefore create a duty imposed upon DHL, and its contracting party, FVS, Inc. for maintenance of those vehicles, mandating that the flooring in them is 'free of unnecessary holes and openings.'" (Pls.' Mem. Resp. Mot. Summ. J. 3.)

Plaintiffs' argument, however, is misplaced. First, the DOT regulation cited by Plaintiffs only talks about the floors being "constructed," not "maintained," to be free of "unnecessary holes and openings." Accordingly, such standards would not be part of Defendant's repair obligation. Second, even presuming the DOT regulations mandated repair – as opposed to simply construction – of truck floors to be free of "unnecessary holes and openings," the Contract at issue did not impose such a duty on Defendant absent the submission of a 425 Form. Indeed, as set forth above, the Contract stated that "[s]upplier shall perform repairs *included on the daily driver write-ups*, which shall be scheduled into the regular workload unless it is a safety related repair or DOT issue. *Safety-related or DOT Issues shall take precedence . . .*" (Id., Ex. B, § 7.0.) In other words, the only distinction in Defendant's obligation to make DOT or safety-related repairs, as compared to other types of repairs, was the priority such repairs took in terms of scheduling. Nothing in the

Contract relieved the driver from reporting such needed repairs on a 425 Form in order to trigger Defendant's contractual duty to act.

Nonetheless, the mere fact that the Contract did not a create a duty for Defendant to independently discover and make preventative repairs to a truck's floor beds does not now relieve it from all liability caused by defects in such floor beds. Rather, under the explicit contractual language, once a 425 Form has been submitted requesting repairs on a vehicle, such repairs shall be made and those that are safety-related "shall take precedence [over normal repairs] and the appropriate DHL Manager shall be notified by the close of business each day, of any such issue." Id. Accordingly, to the extent that Plaintiff submitted a 425 Form to Defendant and thereby put Defendant on notice of a hazardous or safety-related condition in his vehicle, Defendant owed a duty directly to Plaintiff to repair that floor in an expedient fashion.[4] Thus, the Court rejects Defendant's blanket argument that no duty of care existed.

### B.     Whether Defendant Was Put on Notice of the Condition in the Flooring that Caused Plaintiff's Accident

---

[4] In its Motion for Summary Judgment, Defendant cursorily argues that "[e]ven assuming arguendo that '425' requesting repair to the floor surface was delivered to FVS, the duties under the contract would not be triggered with a '425' alone. Rather, DHL had to approve the repair in addition to the '425'." (Def.'s Mot. Summ. J. ¶ 11.) It goes on to claim that all repairs in excess of $250 must be submitted to DHL for approval, and DHL did not approve any request to repair the floor surface of the truck. (Id. ¶¶ 12-13.)

Notably, however, the Contract itself says nothing about repairs above $250 requiring express approval by DHL. In the only testimony to address this point, Aubrey Felton of FVS stated simply that if FVS received a request for repair that went above $250, FVS would have to contact the DHL Express Area fleet manager who would issue a fleet authorization number before any repairs would be done. (Felton Dep. 10:17-11:23.) The reasonable import of his testimony is that the burden fell on FVS to obtain a fleet authorization from DHL in the event of a repair costing more than $250. Defendant does not even concede that it received a 425 to make repairs to the floor, let alone present evidence that it contacted DHL for authorization to make such repairs.

14

Having found that a duty of care flowed from Defendant to Plaintiff under the Contract, the Court turns to the next point of contention – whether Plaintiff ever triggered that duty by properly submitting a 425 Form to Defendant specifically identifying the floor defect that caused his accident. Based on the evidence of record, a genuine issue of material fact clearly exists on this issue.

Plaintiff expressly testified that, two to three weeks prior to the accident, he submitted a 425 Form between ten to fifteen times requesting repair of the floor of the vehicle:

Q. Now, you told me that as concerns the floor of the 310562, your vehicle, you had told somebody about three weeks before the accident?

A. Two to three weeks before the accident, yes.

Q. Okay. And you also completed a 425?

A. Yes, ma'am.

Q. Is that in the pre part of the form or the post part of the form, do you recall?

A. It would have been in the pre.

Q. All right. And so did you – what exactly did you write on the pre form?

A. It wasn't that complex. It was a very simple form that listed windshield wiper, horn, wheel, any other defects.

Q. It had other?

A. And it had other. So, I would write crack in floor.

Q. How many times did you write crack in floor?

A. 10 to 15 times.

Q. Well, did you ask anybody why isn't this getting fixed, I'm writing it down 10 to 15 times.

A. No, because that was general – they were overwhelmed with work.

Q. Who was overwhelmed?

A. The service technicians for First Vehicle.

Q. At that point in time in October of '08?

A. I believe so, yes. They were always very busy.

Q. Who did you tell that there was a crack in the floor?

A. I specifically remember telling Big T, Tom Weaver.

Q. Was that on the first occasion you reported it, you told him?

| A. | Yes. |
|----|------|
| Q. | What was his response? |
| A. | I'll get to it. |
| Q. | Did you tell anybody else? |
| A. | Not to my knowledge. |
| Q. | You didn't tell your supervisor? |
| A. | The supervisor would have a noticed a deficiency noted on the 425. So, yes, I would have told the supervisor. |
| Q. | Did you have any discussion with – your supervisor was Paul Talarico? |
| A. | Yes, ma'am. |
| Q. | Did you have any discussion with him about the crack in the floor? |
| A. | Not to my recollection, no ma'am. |
| Q. | And that's what you wrote, crack in floor? |
| A. | Yes. |
| Q. | Did anybody else drive 310562 between the time you noticed the crack in the floor and the day of the accident? |
| A. | I don't believe so, no. |
| Q. | Did you notice it on every occasion you completed a 425 about it? |
| A. | Yes, ma'am. |

(Argentieri Dep. 116:4-118:24.) Plaintiff then went on to testify that he put the 425 Form in a box in the DHL offices. (Id. at 112:5-114:1.) Although neither Mr. McEnhill nor Mr. Talarico could recall hearing anything about the cracked floor in Plaintiff's truck, neither of them could affirmatively state that no request for repair had ever been made. (Talarico Dep. 83:8-84:3, 84:17-20, McEnhill Dep. 30:8-17.) Drawing all inferences in Plaintiff's favor, sufficient evidence exists to create a genuine issue of material fact as to whether Plaintiff provided Defendant with the appropriate 425 Form noting the cracked floor.

Defendant's contrary arguments do not persuade this Court otherwise. First, it contends that the box in which Plaintiff deposited his alleged 425 Forms was controlled by DHL, not by FVS. (McEnhill Dep. 20:10-24.) As such, it asserts that even if the Court were to accept that Plaintiff

filled out and deposited the 425 Form in the slated box, Plaintiff has no evidence that any 425 Form noting a floor defect was ever sent by DHL and actually received by FVS.

Such an assertion, however, disregards Federal Rule of Evidence 406, which states that "[e]vidence . . . of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the . . . organization on a particular occasion was in conformity with the habit or routine practice." FED. R. EVID. 406. The routine practice of an organization is defined as "the regular practice of responding to a particular kind of situation with a specific type of conduct." Kenneth S. Broun, 1 MCCORMICK ON EVIDENCE § 195, at 783 (6th ed. 2009). The purpose of habit evidence is "to fill in a gap in direct evidence about what [an organization] did on a specific occasion with circumstantial evidence sufficient to reasonably allow one to conclude that the [organization] probably acted in conformity with [its] usual pattern on the occasion in question." Pugh v. Wynder, No. CIV.A.07-3399, 2008 WL 2412978, at *14 (E.D. Pa. Jun. 10, 2008). The Third Circuit has expressly approved of the use of such evidence to establish that a corporation acted in conformity with its settled practice. Vanalt Elec. Constr. Inc. v. Selco Mfg. Corp., 233 Fed. Appx. 105, 108 (3d Cir. 2008); Schwartz v. Comcast Corp., 256 Fed. Appx. 515, 519 (3d Cir. 2007).

Plaintiff has provided substantial evidence of the procedure generally used by DHL drivers to report and obtain repairs to DHL vehicles by FVS. Mr. Talarico testified that, in general, after the driver completed a 425 Form, the manager on duty would sign off on it. (Talarico Dep. at 31:19-16.) Mr. McEnhill then went through all paperwork, including the 425 forms. (McEnhill Dep. 26:10-12.) According to Paul Roberts of FVS, once a DHL supervisor went through the driver's reports, any reports notating repairs to be made would be given to FVS technicians. (Def.'s Mot. Summ. J., Ex. E., Dep. of Paul Roberts, 33:4-14, Sept. 21, 2010 ("Roberts Dep").) The technicians would "take a look at the forms, notate what has to be looked at, repair if they could and sign off

17

that the vehicle was ready to go." (Id. at 33:17-20.)  If the repair was to cost more than $250, FVS would call DHL for a fleet authorization number.  (Felton Dep. 10:17-11:23.)

The routine use of this practice to successfully obtain vehicle repairs from FVS was confirmed by several witnesses.  First, DHL driver Michael Ritz, expressly testified:

> Q.    But when you had problems with your doors and you wanted First Vehicle Services mechanics to fix them, did you complete a 425?
>
> A.    Yes.
>
> Q.    Was the 425 completed and signed off by your supervisor?
>
> A.    Yes.
>
> . . .
>
> Q.    Right.  My question to you, though, was do you know if the 425 was delivered to the mechanic before the repair was made?
>
> A.    Before the – I would assume, because the repairs were made.
>
> Q.    When your step bumper was damaged, did you complete a 425?
>
> A.    The driver the night before did.
>
> . . .
>
> Q.    And when the locking mechanism broke, did you complete a 425?
>
> A.    Yes.
>
> Q.    And when the welded mechanism broke, did you complete a 425 again?
>
> A.    Yes.

(Ritz Dep. 21:11-22:22.)  Another driver, Gregory Sangmeister, likewise testified:

> Q.    At the time period when your floor was fixed by Steve, a year you cannot recall, were you required to complete 425s before repair was done on your vehicle outside of preventative maintenance?
>
> A.    That was the policy, that was the procedure, correct.

 (Sangmeister Dep. 18:15-19:11.)  Finally, James McEnhill indicated that he used this same procedure of filling out a 425 and delivering it to a mailbox next to DHL offices in order to obtain FVS-made repairs to his vehicle.  (McEnhill Dep. 20:10-22:15.)  Considering such evidence under Federal Rule of Evidence 406, the Court may now make the inference that Plaintiff's completion of

a 425 Form noting the cracked floor, together with the deposit of that Form into the box located in the DHL offices, resulted in transmission of that document to FVS, thereby placing it on notice of the defect.[5]

In an alternate argument, Defendant asserts that it was not the original crack on the floor that caused Plaintiff's accident, but rather a second crack or "lip" on the floor of the truck, about which Plaintiff admits he did not complete a separate 425 Form. Defendant goes on to contend that there is "no evidence that this lip existed long enough for FVS to have been aware and to conclude that FVS should have known of its presence would require a fact finder to engage in speculation and conjecture." (Def.'s Mem. Supp. Mot. Summ. J. 7.)

Defendant's contention, however, misconstrues Plaintiff's testimony regarding the "second lip." Although the term "second" seems to connote a completely different defect, Plaintiff makes clear that the condition that caused his accident was simply a worsening of the original defect:

> Q.    Did the condition of [the crack] change at all from the first time you noticed it until the time of your accident?
> A.    Yes.
> Q.    How did it change?
> A.    It worsened.
> Q.    How did it worsen?
> A.    It created a lip that caused me to fall.
> Q.    At any point in time did you report that a lip was present on the floor?
> A.    Yes.

---

[5] See Schwartz, 256 Fed. Appx. at 518 (holding that defendant Comcast's evidence of its consistent policy and practice regarding delivery of the Subscriber Agreement to new customers constituted prima facie evidence that plaintiff was aware and had actual knowledge that the services he accepted were being offered pursuant to a subscription agreement); Gen. Elec. Capital Corp. v. Flynn, Nos. CIV.A.91-7666, 91-7679, 1993 WL 232292, at *3 (E.D. Pa. June 23, 1993) (holding that in order to prove that it properly sent notice to defendants, plaintiff could use evidence that it sent proper notice in the normal and routine course of business).

Q.  And how many occasions?

A.  On that first occasion.

Q.  I thought you said you wrote crack on the floor?

A.  I did.

Q.  Who did your report a lip to?

A.  Well, I told them that the whole floor was cracked.  There were – go ahead.

Q.  On the 425 you wrote the words crack in floor?

A.  Yes, ma'am.

Q.  And what did you tell Big T [Tom Weaver]?

A.  That the floor was broken.

Q.  Okay.  Did you report to anybody that a lip was created?

A.  I believe TJ [Weaver] and I went over and looked at it specifically and I showed him the crack and the lip that was created on the side.

Q.  And when you and TJ went over and looked at it, was this the first occasion that you reported it?

A.  Yes, ma'am.

Q.  So, the lip was already on the first occasion [that Plaintiff reported it on his 425]?

A.  Yes.

Q.  How did it change?

A.  It created a second lip that caused my fall.

Q.  This second lip that was created that caused your fall, did you report the second lip to anyone, either orally or in writing?

A.  No, ma'am.

Q.  How come?

A.  I believe it just happened that day.

(Argentieri Dep. 119:1-121:6.).

Q.  So is the crack the area where this second lip was created?

A.  Yes.

Q.  Okay.  When did you first observe the crack?

A.  When I first reported it, about there weeks prior to the fall.

Q.  And when did you first observe the – what are we calling this?

A.  The first lip.

| Q. | The first lip that's shown in C? |
|----|----------------------------------|
| A. | The same time I reported the crack. |
| Q. | Did you ever use the word lip or raised area to anybody? |
| A. | Yes, I believe so. |
| Q. | To whom? |
| A. | To Tom Weaver. |

(Id. at 126:15-127:9.)  Based on this testimony, together with the photographs included as exhibits to Defendant's Motion for Summary Judgment, it is reasonable to infer that the "second lip" was nothing more than an exacerbation of the original crack in the floor and was foreseeable from the presence of that first "lip."  As the evidence suggests that Defendant was aware of the initial crack, a jury could reasonably find that Defendant should have known that its failure to correct that condition would eventually result in the formation of a second "lip."[6]

In short, the Court recognizes that competing evidence exists as to (1) whether Plaintiff properly filled out and submitted a 425 Form regarding the crack in the floor, and (2) whether that Form was ever delivered to Defendant, thereby giving it actual notice of the condition.  Resolution

---

[6] Defendant cites to multiple cases for the proposition that FVS had to be on actual or constructive notice of the dangerous condition, and that where there is no evidence that a condition existed for a reasonable length of time, a fact finder would have to engage in speculation and conjecture to find that the defendant should have known of the condition. Notably, however, all of the cited cases deal with premises liability, *i.e.* the duty of a possessor of land to protect invitees from harm caused by a condition on his or her property.  See Deane v. Trump Plaza, No. CIV.A.08-2747, 2009 WL 192510, at *2-3 (E.D. Pa. Jan. 26, 2009); Scruggs v. Retail Ventures, Inc., No. CIV.A.06-1148, 2008 WL 2687147, at *5 (W.D. Pa. July 8, 2008); Cox v. Wal-Mart Stores East, L.P., No. CIV.A.07-2391, 2008 WL 4072804, at *4 (E.D. Pa. Aug. 26, 2008), aff'd, 350 Fed. Appx. 741 (3d Cir. 2009); Neve v. Insalaco's, 771 A.2d 786, 790-91 (Pa. Super. Ct. 2001).  In such cases, the threshold for establishing a breach of duty is actual or constructive notice to the landowner of such a defective condition.  In the case at bar, however, the question is whether Defendant negligently failed to perform a contractual undertaking.  As such, the bounds of the notice and breach of duty elements are governed by different standards. See Cox, 2008 WL 4072804, at *4 ("The nature of the duty which is owed in any given situation hinges primarily upon the relationship between the parties at the time of the plaintiff's injury.").

of such disputed issues requires both credibility determinations and weighing of evidence. As Federal Rule of Civil Procedure 56 dictates that such determinations fall within the province of the trier of fact, the Court declines to grant summary judgment review on this ground.

### C.    Whether a Defective or Unsafe Condition Existed

Defendant's final effort to obtain summary judgment in its favor asserts that Plaintiff's claim is not actionable under Pennsylvania law due to the minor nature of the claimed defect. This argument stands on tenuous grounds.

Under Pennsylvania premises liability cases, "where a defect is 'obviously trivial,' the court must hold as a matter of law that the property owner was not negligent." Murillo v. United States, No. CIV.A.09-1974, 2010 WL 786542, at *3 (E.D. Pa. Mar. 8, 2010) (citing Breskin v. 535 Fifth Avenue, 113 A.2d 316, 318 (Pa. 1955)). In such cases, summary judgment is appropriate. Id. Unless a defect is obviously trivial, however, "its gravity should be a fact determined in light of the circumstances of the particular case." Ozer v. Metromedia Rest. Group, Steak & Ale of Pa., Inc., No. CIV.A.08-940, 2005 WL 525400, at *6 (E.D. Pa. Mar. 7, 2005) (citing Massman v. Philadelphia, 241 A.2d 921, 923 (Pa. 1968) (finding that circumstances required question of triviality of defect should be decided by jury)).

Defendant, in this case, cites to examples of defects which have been found to be so obviously trivial as to preclude imposing liability, including a cobblestone sunk one and a half to two inches, Bosack v. Pittsburgh Railway Co., 189 A.2d 877, 879-81 (Pa. 1963); a hole in the street that was three feet long, one inch wide and one-half inch deep, Bullick v. Scranton, 302 A.2d 849, 849 (Pa. Super. Ct. 1973); a two or three inch difference in sidewalk level between joints or divisions, Cline v. Statler, 24 Pa. D. & C.4th 289, 290-92 (1997), aff'd, 726 A.2d 1073 (Pa. Super. Ct. 1998); a rise where the driveway met the sidewalk on defendants' property of between .75

inches and 1.5 inches, <u>Lucacos v. Tzinis, et. al.</u>, 76 Pa. D. & C.4th 404, 406-08 (2005); a one and a half inch difference between the levels of two abutting curbstones, <u>McGlinn v. Philadelphia</u>, 186 A. 747, 747 (Pa. 1936); an uneven and unpaved step between a curb and sidewalk that was two to four inches below the sidewalk level, <u>Foster v. W. View Borough</u>, 195 A. 82, 83-84 (Pa. 1937); a manhole cover that projected two inches above the surface of the street, <u>Harrison v. Pittsburgh</u>, 44 A.2d 273, 273-74 (Pa. 1945); and a saucer-like depression of one and a half inches involving a water valve housing. <u>Plischke v. Dormont Borough</u>, 33 A.2d 480, 482 (Pa. 1942).

In the present case, the sole evidence submitted by Defendant in support of its claim of triviality consists of four black-and-white, blurred copies of photographs of the purported defect that caused Plaintiff's accident. Defendant does not indicate either who took the pictures or when they were taken. Moreover, although Defendant surmises – based apparently on nothing more than a eyeball guess – that the alleged lip is "less than half inch or the thickness of a finger,"[7] there is absolutely no evidence in the record describing any measurements or dimensions of the crack or the lip. Finally, even assuming the Court could conclude that the crack was only half an inch in nature, Defendant's cited cases are inapposite. Defendant provides no legal support or expert testimony to show that a half-inch crack on the floor of a truck – a surface that one normally expects to be smooth and free of unnecessary cracks[8] – is as trivial as similar size gaps on pedestrian sidewalks – which are surfaces regularly subject to weather and wear and tear.

Given the complete absence of evidence as to the nature of the crack and lip on the floor of the truck, the Court has no basis on which to declare, as a matter of law, that such a defect either is or is not trivial. Therefore, the Court assigns resolution of this issue to the trier of fact.

---

[7] (<u>See</u> Def.'s Mem. Supp. Mot. Summ. J. 9.)

[8] As set forth above, DOT regulations state that "[t]he flooring in all motor vehicles shall be substantially constructed, free of unnecessary holes and openings . . . ." 49 C.F.R. §393.84.

## IV. CONCLUSION

In light of the foregoing, the Court is left with the inevitable conclusion that summary judgment is not proper. This case is replete with disputed issues of fact going to the very core of Defendant's potential liability. As such, Defendant's Motion is denied and the parties are directed to prepare for trial.